The fourth district appellate court of the state of Illinois has now convened. The Honorable James A. Connick presiding. This is our case number 420-0283, VB Apartments LLC v. Ameren. Would counsel for the appellate please state your name for the record? Stephen Wood. And would counsel for the appellee please state your name for the record? Julietta Kosiba. Thank you. You may proceed. Thank you. May it please the court, counsel. My client is asking this court to reverse the circuit court granting defendant's motion for summary judgment. A little bit of a history of the litigation. This case was filed in the summer of 2014 and plaintiff's amended complaint was then on file in January of 2015. Since then, the allegations in the case have not changed at all. Since January of 2015, the parties have appeared before Judge Lawrence in McLean County Circuit Court 20 times for status conferences, took over 10 depositions, and we spent several years working this case up to get to trial, um, but including plaintiff's expert depositions, uh, several depositions of Ameren employees. And, uh, all this was done to try to determine whether or not Ameren was negligent and to what extent and what damages there were. Uh, several years later, uh, Ameren filed motion for summary judgment, essentially for the purposes of that motion conceding the fact that they were negligent and that, uh, I know that they would, if it went to trial, they would dispute that. But for purposes of their motion, they, uh, they're conceding that at least we have evidence that they were negligent and that plaintiff was damaged by that negligence. But they filed, uh, legal defenses, uh, saying that a tariff they filed in 2010 bars plaintiff's claim, uh, even if plaintiff has a claim that plaintiff should have brought the claim in the, uh, Illinois Commerce Commission rather than the Circuit Court. And even if, uh, the tariff didn't bar the claim and it was properly in the Circuit Court, uh, the economic loss doctrine of Mormon, uh, barred the claim. Uh, I'm not going to go into it too much, but the facts are pretty much, uh, undisputed, um, both at the trial court level and this court level. Plaintiff doesn't even have, uh, an issue with the way defendant laid out the facts as they were, uh, just for the court's edification. Uh, plaintiff owns an apartment building in Normal, Illinois, uh, that rents out to Illinois State students. Uh, Ameren defendant, uh, provides power to that building. Uh, in 2000, early 2000, late 2011, 2012, that was being planned, uh, how to power the building. All the decisions made in terms of how to power the building were, uh, Ameren's decisions in deciding to do a pole mounted transformer. Uh, and then essentially what happens is it's plaintiff's responsibility to put a breaker box on the side of their building. And then they had electrical contractor who took from the breaker box, uh, attached a bunch of wires, and then Ameren connected those wires to the overhead transformer. Uh, plaintiff's allegations are that Ameren set up the termination, basically the connection in such a manner that water was allowed to get into the conductors, the wires. And well, this, uh, created a lot of problems. One, it corroded the wires, but even more importantly, the water was allowed to whip down through the wires all the way into plaintiff's breaker box, which is supposed to be a waterproof cabinet. And the breakers, uh, tripped, uh, a number of times. Uh, the, uh, plaintiff's, the two officers, uh, of the plaintiff, uh, both the Brown brothers at that time, um, were estimated to spend over 600 hours, uh, responding to this property damage, including, um, and they had to replace three breakers, fly them in from various states. And though they have not done so yet, they have an electrical contractor who tell them, tells them that they will have to replace the, uh, wires as well. So there's a bunch of property damage and they had to spend a lot of time responding, uh, to that. Um, part of plaintiff's allegations are that, uh, defendant violated the NESC, which is the national electric safety code, which they're, uh, they admit that they have to follow. And there are two sections in the NESC, the 370C, it says a cable termination shall be designed to limit the likelihood of moisture penetration into the cable where such penetration is detrimental to the cable. And section 333B, which says cable accessories and joints shall be designed to limit the likelihood of moisture penetration into the cable where such penetration is detrimental to cable. Uh, plaintiff has alleged that they, uh, Ameren violated both of these sections of the NESC. Uh, plaintiff has testimony from an expert, um, Tom Adams, who was deposed in this case, uh, in which he says that Ameren violated the NESC, those, those provisions specifically. Uh, and, and then also another one of plaintiff's disclosed witnesses, Rand Bierman, who is, uh, the electrical inspector for the town of Normal at the time all this occurred. Um, he was, uh, defendant elected not to depose Mr. Bierman, but he did execute an affidavit in this case in which he said that it was, uh, it was in his opinion, Ameren's basically fault that the water got through the wires and that the affidavit is in the record. Uh, so we spent several years working this case up to those facts. Um, and then the, the Ameren filed this legal defenses and judge Lawrence ruled in favor of, uh, or the circuit court, I should say judge Lawrence ruled in favor of Ameren on all three of their claims. Number one, that it's tariff barred, uh, plaintiff's claim. Uh, plaintiff disagrees with this interpretation. Uh, plaintiff, uh, put in pertinent part, uh, cited to the tariff in its brief, but actually Ameren, um, as part of its appendix cited the entire thing, if the court is interested, put their entire, um, tariff. Um, but the section that's probably the most important is the limitation of liability. Um, there are two, uh, two important, uh, phrases or, uh, provisions I should say, I'm sorry. Um, which they use to say that they should not be liable, but we, we used to say that there is a claim and they're cited on page 10 and the top of page 11 of our brief. And it says company is not responsible or liable for damages to customers, motor, or any other equipment or property, not due to negligence of company. And then there's another provision that says, uh, the company shall not be responsible nor liable for electric energy from, and after the point at which it first passes to the wires or other equipment owned or controlled by the customer and customer shall protect and save harmless company from all claims for injury or damage to persons or property occurring beyond said point, except where injury or damage shall be shown to be occasioned solely by the negligence of the company. Well, plaintiff's claims are, do sound in negligence. That's what plaintiff is alleging and that, um, it suffered damage as a result of the negligence. Uh, they said in the Sheffler case, they talk about how these tariffs, uh, have the effect of statutes. And as such, um, when interpreting a statute, only courts must attempt to ascertain and effectuate the intent of the provision by applying the plain and ordinary meaning plaintiff would contend that the ordinary meaning of those two provisions, um, while limiting, uh, Amarin's liability in some situations, uh, clearly provide for claims that sound in negligence. Uh, so, uh, we'd ask that the court, uh, review that and reverse that decision by the circuit court. Uh, in addition, Amarin argued in the court circuit court agreed that even if the tariff didn't bar the claim that, uh, the plaintiff should have filed its claim in, uh, the Illinois commerce commission. And those plans believe that this flies directly in the face of the public utilities act, which allows for, uh, claims to be filed in 220 ILCS five slash five dash two Oh one. Um, it talks about, uh, it talks about if, if, if, if a public utility fails to follow the rules and damages are caused by that rule, that rule is longer than this. Of course, it's on page 11 of our brief and action to recover for such may be brought in the circuit court by any person corporation. Um, despite the plain language of the public utilities act, according to jurisdiction trial court discharges responsibility, um, citing largely to the Sheffler case. Now the Sheffler case, uh, States that, uh, if a claim is against the utility is one for reparations jurisdictions with the commission, but if it's for civil damages, it can be brought in the circuit court. Um, I guess it's all in the interpretation of the court, what the claims for blank would claim that this is for civil damages. Uh, there is no argument that Amron charged unjust rates. There's no claims for, uh, injunctive relief. This is for money damages. Plaintiff would claim that this belongs in the circuit court and, uh, the court should, should have exercised its jurisdiction. Um, Sheffler was a case that was, uh, largely relied upon by, uh, Amron and by the trial court and its decisions. Uh, Sheffler is distinguishable, uh, on for many different reasons, uh, Sheffler, uh, perhaps bad fakes facts make bad law, but Sheffler was an interesting case when compared to ours in that Sheffler was filed, I believe five days after a large storm in Chicago, where it's basically unlimited number of plaintiffs could, could sue com ed for any damages that, that stemmed from the storms where the power went out. Uh, this is not a situation like that. This is a targeted case where Amron's negligence, um, in designing, uh, the terminations cause specific property damage to one plan. And, uh, and there's no allegations in Sheffler. As far as I could tell, uh, that w where there were allegations that, uh, com ed violated the NESC, which is what we have, what we have in this case. I want to ask you a question in Sheffler. There was a count, uh, which involved a violation of the consumer fraud and deceptive businesses practice act, right? I believe that's correct. Yes. Okay. And how did the Supreme court handle that count five in the Sheffler case? Count five, uh, after the count five being that was the consumer fraud allegation. I have it right here. Um, um, off the top of my head, I know all of the counts were dismissed at some point. I don't know if that was, there was a situation where they were allowed to re I know they were allowed to, uh, refile several times. And finally the court said, I've had enough and said, you can't file the fourth or fifth complaint or whatever it was. Okay. Here's why I'm asking that question because, um, it seemed like to me, the Supreme court as accounts one, two, three, and four in Sheffler basically ruled on the tariff on the jurisdiction of the commerce commission. Um, and that's how they resolve those particular counts. But as the count five, it looked like to me, the Supreme court didn't, uh, rely upon the tariff or the jurisdiction for the commerce commission, but simply said, uh, the plaintiff couldn't allege facts to demonstrate the violation of the consumer fraud and deceptive business practices act. And the reason I bring that up is because I wonder if there was a comparison of that count five and, uh, your allegation here, uh, about the, uh, national electrical safety code. Do you understand where I'm going with this? I'm trying, I think it might help your argument, but it seems like to me, um, the Supreme court handled that particular account different than it did the other ones. And maybe because your allegation is a violation of the NESC, the Supreme court might make a similar type of analysis. Well, I would agree with you in that in terms of, uh, well, I'm not sure I know what I'm talking about. No, sure. So you don't have to agree with me yet, but I'd like to hear your comment on that though. No, in terms of, uh, the NESC, what I will say to that is the ICC, um, has adopted the NESC provisions, the NESC as its own rules. And as part of the plain language of the public utilities act, which is the same act that created the Illinois commerce commission. There's that part there, there's that section that a plaintiff cites to, which says a violation of the rules, um, and damage that's damages to the stem from the violation of the rules. You can bring a claim in the circuit court. So I think that there's a specific, I just find it. I think we made this point in our brief when I discussed, uh, when we discussed the Durica case and that the public utilities act creates, or there is a section that allows for, uh, claims to be brought in the circuit court specifically says that. And it seems that the way Amarin is arguing it and the way that the circuit court applied it is there's no way that a claim could be brought in the circuit court. And instead it should be brought in the commerce commission. Um, in terms of the consumer product, the only thing I would say, and, uh, to be quite frank with you, I hadn't seen that connection. So I wasn't prepared to compare that to ours. I'd be happy if you did. And that helped us out, but, um, but, uh, but I would say that the, uh, where this could be, um, distinguished from Scheffler would be that the fact that there are specific, uh, violations of the NESC and, and Tom Adams talks about that in his deposition, the violations of the NESC and how that's, how that's different. Uh, and I believe that all of the defense witnesses, I'd say Martin Barons and all those Henry Gay. And you go down the line, I think they all agree that they're bound by the NESC or they're supposed to follow the NESC and, and they all agree, um, laid up by, well, they wouldn't necessarily agree, but, um, for purposes of this motion, they would agree. Uh, I think that, they didn't do enough to prevent water from getting into the wires. I don't, I hope that answered your question somewhat. I, um, like I said, just as one follow-up, um, in your reply brief, you say that, uh, Scheffler is distinguishable because you have an allegation here of the that, um, distinction you make in her brief. I couldn't find it. I'll have to ask her that as well, but, um, I don't think, I don't think kind of response to, to what you've argued. I haven't seen, uh, such a response. Uh, the opposing counsel does, uh, say to Scheffler stating that the court should follow it, uh, for a lot of different reasons, but I don't think that they make that, uh, I don't think they do, they distinguish that specifically. It seems to me, you're kind of hanging your hat. I mean, you've got several arguments, but a big, a major issue, at least in my mind, is that, uh, you've alleged this violation of the national electrical safety code. Um, and I'm just not exactly sure what the response, um, from opposing counsel is to that, but I guess that's the question I should ask her. She'll probably address it now that I brought it up, but, um, it sounds like you haven't really seen, um, uh, an argument that addresses that specific issue yourself, if I'm understanding your responses. No. Okay. And one other thing I'd like to point out, and this is in our brief, our papers, of course, too, is that it's plaintiff's position and their support this based on, uh, documents that have been filed in the Illinois Commerce Commission that had plaintiff filed this case in the Illinois Commerce Commission. Ameren would be arguing the exact opposite and that, and that the plaintiff should have filed it, uh, in the circuit court. And they use the plain language of Scheffler in motions filed, filed there, where they say that, uh, you know, claims for, uh, civil damages lie in the, in the well, yeah, you should have, yeah, we're, we're, uh, we might be liable, but you should have, you should have sued us for breach of contract rather than tort. It's something, you know, it's, it's constantly, um, I guess not disputing what the facts of the case are. One thing that's, that's pretty clear, I would say is that there's enough evidence on this record of negligence caused by Ameren that caused damages to the plaintiff. And, uh, what essentially Ameren is trying to say is, so what, that, uh, that, that, that there's nothing you can do about it based on the tariff. And even if didn't, even if the tariff didn't apply, then you'd have to file it in the Illinois Commerce Commission. Uh, meanwhile, if we did file it in the Illinois Commerce Commission, maybe they've, they say it's, it's time barred by now. And, or, uh, or they, depending on the lawyers they had, they would, they would say we should kick it back to the I'll address whatever, uh, counsel says in, in her argument is I don't think that the plaintiff and Ameren, uh, made a mistake in, in working this case up and spending our client's money and time for four years, uh, for trial, this should be a case. Uh, this should be a case that should be dealt with in the circuit court. And, uh, and, uh, for those reasons and all the reasons that we, um, and plaintiff states in its brief, we'd ask that this court reversed the trial court and, uh, send it back to the circuit court for further proceedings. Thank you. Thank you, counsel. We're here from the appellate. May it please the court. Um, as Mr. Wood explained the, uh, circuit court in granting Ameren summary judgment and denying the plaintiff's motion for reconsideration relied primarily upon two precedential decisions, Shuffler and Donovan. Those cases involved, um, sub substantively similar facts and claims, um, as well as the same issues and should govern the court's review here. Um, going, starting off with Shuffler, um, the court in that case, the explained that although courts, although claims for damages can be brought in the circuit court claims for reparations, which actually include claims for inadequate service fall within the ICC is exclusive jurisdiction. And in that case, the plaintiffs actually brought their claim pursuant to the public utilities act, um, alleging negligence justice plaintiff does. So here, yes, it is true that they, um, as far as we know, and we can tell from the opinion, they did not allege an NESC violation, but going back to the public utilities act, that is what's the basis of the plaintiff's claim here. The NESC does not provide for any Um, at least one where you have an expert testifying about a breach of a standard of care. Um, that expert may rely upon certain standards like ANSI or in this case, the NESC, the NESC does not supply the independent claim. It's the public utilities act. Um, that was at, was the basis of the plaintiff's claim in Shuffler as well as here. Um, and more specifically in Shuffler, the plaintiffs argued that the utility had a duty to adequately maintain its facilities to provide continuous, adequate, efficient, and reliable power. And they were alleging that the utility was negligent with respect to its planning process and maintaining its infrastructure. Similarly plaintiff here alleges in its complaint that Amarin had a duty to provide, um, efficient, reliable, and safe equipment and that it breached its, um, and that it was negligent, excuse me, in designing, installing, and maintaining its equipment. And, um, as sort of discussed already that Shuffler plaintiffs, just like and that falls within the circuit court's exclusive jurisdiction, but the Supreme court of Illinois made clear that it's not the label of the claim nearly saying that one is seeking damages, but rather courts must look at the nature and substance of the allegations to determine whether they are in fact claims for damages as, um, as it relates to assessing jurisdiction. And in examining the nature of the allegations that the plaintiffs made there, um, the Shuffler court held that the claim was bar fell within the exclusive jurisdiction of the ICC because plaintiffs, um, were, uh, seeking damages for allegedly, um, ineffective service or setting up electrical service to the property and its infrastructure that is, um, installing and maintaining its electrical equipment. Therefore, um, the court should apply Shuffler to the facts of this case. Um, and there is, um, in our argument, no meaningful distinction between this case and Shuffler. The fact that, um, there are multiple plaintiffs in that case should not make it any different. Um, the law is the law. Um, the fact that the, um, no NESC violation was alleged there should also not make a difference as I had already explained, uh, because that's merely the basis to analyze, um, whether there is an alleged breach, not an independent right of recovery, uh, which is what the public utilities act governs. And ultimately, as the Shuffler court explained, it is the nature of the allegations that the court must look at and not merely, uh, the labels for the claims. And lastly, um, the, in both cases, the plaintiffs are seeking damages for both property damage and financial losses, um, that were allegedly that allegedly resulted, um, from power outages that the utilities that occurred as a result of the utilities alleged, um, failure to adequately maintain its, um, infrastructure. And the cases cited by plaintiffs simply do not overcome the application of Shuffler here, uh, starting off with Durica. Um, in that case, the plaintiffs asserted claims for trespass conversion and a violation of the wrongful tree cutting out for the utilities contractor allegedly, um, cutting down trees on the property on the plaintiff's property without authorization. The court determined that the provision of the public utilities act relating to vegetation management, um, did not preclude the plaintiff's independent claims there. Um, that provision is not at issue at here. Um, the claims are different and so are the facts, the wrongful tree removal in Durica, um, did not concern the inadequacy of the utilities negligence in the role as electricity provider. Um, the court in that case, even itself recognized Shuffler, um, which is like this case as being distinguishable. Um, similarly, the non-precedential cases that Mr. Wood was referring to from the ICC and mentioned in the customer utility relationship implicated, um, the complainant was rather bringing his claim as a neighboring property owner. And in the Greenman case, um, which the complainant alleged that Ameren allegedly violated his duty to be properly notified of a power outage, um, that occurred as a result of Ameren replacing a utility pole in the area. That therefore, um, Ameren's, Ameren did not need to address the points of law in that, that are at issue here in that case. And it did not take an actual conflicting, there is no conflicting position here. Uh, going back to Shuffler, Shuffler also, um, addressed the question of the tariff as Mr. Wood indicated. Um, looking at the, uh, utility tariff that governed the relationship between provision, um, that limits recovery to pro rata reduction of monthly charges in cases of interruptions, deficiencies, or imperfections in electrical service, both the complaint and plaintiff's discovery responses. Um, and even as, as Mr. Wood, um, argued here before the court, plaintiff is seeking damages associated with interruptions in service. And so therefore that pro rata reduction clause immediately applies as to bar plaintiff's claim here. Um, I know Mr. Wood discussed, um, two provisions that allegedly permit for negligence causes of action. The plaintiffs in Shuffler tried to make that same argument. There too was a pro rata, in that case, there was also the pro rata reduction type of clause, as well as, um, a negligence clause allegedly providing for recovery for negligence actions. Um, and the Supreme Court of Illinois rejected the argument in Shuffler. It held that even though the plaintiffs couched their claims in terms of negligence, ultimately their claims fell within, um, the provision of the pro rata reduction clause here, there. And similarly plaintiff's claim falls within the provision of the pro rata reduction here. And that clause supersedes, um, any application of the and lastly, um, as I explained, the trust circuit court relied upon the Donovan case in reaching its conclusion as to the economic loss doctrine. In that case, the plaintiffs alleged that the defendant County failed to responsibly operate and maintain its water system. Similarly, plaintiff contends here that Ameren, um, failed to, um, design, install and maintain its electrical system properly. Ameren's alleged failure to seal the terminations, um, here is not unlike the County defendant's failure to properly chlorinate its water system in Donovan. Both claims concern property damage, um, that resulted, um, as from the defendant's alleged negligence and maintaining, um, its own property. Um, in this case, but let me ask you a question. Obviously you're getting into your discussion regarding the Mormon doctrine. And my question is this, of course, opposing counsel, they argue in their brief that the exception that applies to sudden and calamitous incidents applies. And I'm having difficulty understanding exactly what that means. What is considered a sudden and calamitous? What do we Mars, which is one of the cases that plaintiff relies upon and sort of trying to indicate what the court is to look at, um, the, what the court looked at for determining what was sudden and calamitous was the, um, collapse of the frame being contemporaneous with the, uh, with what would cause that damage, the, the thunderstorm, um, Moorfield, um, which is another case cited by plaintiff indicates that it's the manifestation of the damage, um, that must be sudden. Uh, there, it was, excuse me, Murfield talks about looking at the suddenness of the occurrence of an event. Yes. Yes. But, um, I, it does talk about that. However, the mold, um, didn't occur suddenly, uh, the mold, but the mold did manifest itself suddenly. Um, but our position would be that whether it is the, um, occurrence or the manifestation, um, it, it is not sudden here because the water intrusion occurred progressively. Um, and it manifested itself, um, over time it took 50, there were 57 power outages. And as plaintiff's own evidence indicated, the breakers weren't damaged, um, instantaneously. It, they, they were damaged as a result of or not, which we would agree with, or whether it, the damage manifests itself suddenly, which can be said about the mold and where field it is of no difference here because both the occurrence and the damage here did not occur suddenly. It occurred over, um, a long period of several months of water intrusion, um, with 57 power outages and plaintiff's own, um, evidence, evidence, um, indicates that, um, which is cited in the brief with, um, quotations from his affidavit about it being a very slow process. Thank you. Um, so even, even if the court assumes, um, that the, that it is necessary to look at, at an exception, um, the sudden or dangerous exception doesn't apply, not only because it's not sudden or dangerous, but also because it did not involve damage to other property, which also must be satisfied for the exception to apply. Um, the Hechtman and Washington court decisions cited in our briefing, um, demonstrate that, um, as well as the, um, Mars decision, both the Washington courts and Hechtman cases indicate that, um, the, um, that in instances where the damage is merely incidental to the, um, alleged qualitative defect, then it won't qualify as damage to other property. Um, those cases like here involved water intrusion and the plaintiffs basically were arguing that, um, defendant was negligent with respect to construction or maintenance, um, or something of that nature with respect to one portion, um, of their condo units and that that system because of the negligence caused damage to other portions of their property. Um, the courts there found that no, that didn't qualify as other property because it all only, um, involved damage that was incidental to, um, a qualitative defect. Similarly, the damage to the breaker, um, alleged here is incidental to the defect that plaintiff alleges with respect to Amarin's electrical system. And the fact that, um, Amarin did not supply the, um, property that plaintiff claims qualifies as other property, the breaker, um, is of no consequence as indicated in the Mars decision. Um, and going back to Donovan, Donovan makes, um, clear that under such circumstances where you have a plaintiff alleging, um, defects with regard to, um, services that the utility was contracted to which, which is the case here, um, as plaintiff, uh, specifically asked Amarin to set up electrical service, um, and plaintiff's complaints regarding that, um, design installation or maintenance relates to constitutes disappointed commercial expectations. And therefore, uh, the economic loss doctrine bars the claim. Um, and for all of the reasons, um, I explained, we would ask that the court affirm the circuit court's ruling. You also have one question. You, uh, said earlier that the NESC does not supply an independent, independent right of recovery. Um, what is your authority for that assertion? Um, your honor, the, that question has not, um, been raised at the lower court. So, I don't have the NESC provisions in front of me. Um, however, throughout all of this litigation, um, and looking at the complaints, the basis for plaintiff's, um, claim is the public utilities act. Um, as Mr. Wood explained in his argument, the NESC has been adopted, um, by the ICC, but, uh, it's not an independent statute. Um, it's only part of the ICC regulations or adopted in the regulations. Yeah. He says it's adopted in its rules. And then he says, therefore, pursuant to the public utilities act, Ameren is liable for all loss, damages, or injury to the plaintiff. Why is that an incorrect statement? Because you must disagree with that. Um, the NESC provides, um, the context for how, uh, the utility is supposed to maintain its system, but it doesn't actually, um, provide, it isn't an independent statute, um, allowing for recovery. I have not seen anything else in the case law that indicates so. And so the plaintiff alleged in its complaint, the public utilities act, and that's the statute Ameren reached a standard of care. Well, it was in the pleadings. It was in the complaint of the amended complaint of plaintiff. Right. Okay. So if I understand your argument though, then there's, there are no ramifications for failure to comply with the NESC as far as you know. Uh, I, I wouldn't say as far as I know, the NESC only provides, uh, the standard of care. Okay. I don't know the answer to this question. So I'm just a little confused, but I appreciate you trying to respond to my inquiries. They're probably not very well stated, but thank you. Thank you, counsel. We'll hear rebuttal now. Thank you. Uh, your honor, just, just quickly, uh, on, on the questioning from, uh, justice Turner, uh, there, um, yeah, plaintiff would say that the public utilities act has this, has a specific section that allows for claims in civil court. And within that section, it's, it talks about violations of ICC rules, um, because ICC has adopted as its rules, the NESC plaintiff's position that a violation of the NESC, um, does allow for a claim in circuit court. And that's, that is our position. Um, as for justice Holder White's questioning regarding the sudden and calamitous, uh, exception to the economic loss doctrine, the facts in this case, as to this are not, um, uh, in dispute, I guess the court would have to decide, um, what they qualify as, um, because what it, what did happen is water did gradually trickle down these wires, corroding the wires, but the impact was sudden once it happened. I mean, there was no warning to the, uh, VB apartments that the next time it rains, you're going to have property damage. You're going to have outages. Okay. Um, so that's kind of, kind of the issue there, although there is testimony on the record in terms of the suddenness that, uh, John Brown, um, noticed that it did happen more often when it rained. So perhaps it overloaded it from, from that standpoint, but, but in terms of how it relates to Muirfield is, uh, um, yeah, the, the water gradually trickled down, but once it hit the breakers, it was a sudden, sudden event that caused the damage. Uh, one thing I'll say too, is, is council brought up about, you can't, you can't talk about power outages. There were 57 outages in, in, in nine months. In this case, it's interesting because according to, uh, you know, Sheffler and other things, uh, you're not, uh, damages for power outages, uh, per se, um, might not be allowed, but what's interesting in this case is that it's property damage, which the property damage led to the power outage. So it's, it's an interesting, it's an interesting case, but what we're arguing, and one of the reasons there's testimony, I believe from Mr. Brown, that they had to pay for the hotel rooms of all these kids because of these outages, we're not claiming that, you know, what, what, what plaintiff was expecting was perhaps a motion eliminated by Ameren saying, oh, you can't claim damages A, B, and C, uh, because of this, but not that there would be no damages, not that there would be nothing based on this. Um, there was a violation of the NESC. Uh, there was damage to plaintiff's property. Uh, we did spend five years, uh, litigating this case, getting it ready for trial and, uh, plaintiff plaintiff believes that the court, uh, either misapplied the facts or, or the law and didn't apply the correct summary judgment standard, which says that it's a summary judgment is a drastic, um, method of resolving the case. And, uh, it should only be done when the moving parties rights are clear and free from doubt. And given this case in the plain language of the tariff, uh, allowing for claims that sounded negligence in the plain language of the public utilities act, which allow for claims brought in the circuit court, uh, it's far from clear from doubt from plaintiff's perspective. And, uh, we'd ask that this court, uh, send it back to the circuit court, uh, for further proceedings. Thank you. Thank you. Council. We'll take the matter under advisement and stand in recess.